E. H. WODEHOUSE, W. W. CHAMBERLAIN AND MARK A. ROBINSON, TRUSTEES UNDER THE WILL AND OF THE ESTATE OF BATHSHEBA M. ALLEN, DECEASED, *v.* HAWAIIAN TRUST COMPANY, LIMITED, TRUSTEE, ET AL.

No. 2115.

ARGUED OCTOBER 17, 1933.          DECIDED OCTOBER 31, 1933.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.

This is a suit instituted in a court of equity for the foreclosure of a mortgage.

On June 1, 1926, the persons above named as respondents, together with E. B. Hallberg, R. A. Vitousek and D. L. Crawford, being desirous of purchasing a certain piece of land, together with the buildings thereon, situate at Waikiki, having an area of 27,300 square feet and known as the Jake Brown property, entered into an arrangement with the Hawaiian Trust Company, Limited, also named as a respondent herein, whereby the trust company loaned to the prospective puchasers the sum of $75,000 to be used as a part of the purchase price and received a deed by the terms of which it was to hold the property in behalf of the purchasers and upon certain trusts therein expressed and which said deed also was to serve as security for the repayment of the loan. Thereafter the interests of D. L. Crawford and R. A. Vitousek under the trust agreement in the property were assigned and conveyed to the United States Investment Corporation, Limited. The deed of trust was amended under date of November 7, 1930, the United States Investment Corporation, Limited, joining therein as one of its parties, for the purpose of authorizing the trust company to mortgage the trust property. On the same day, to secure repayment of a loan given for their benefit by the present complainants, who are trustees under the will of Bathsheba M: Allen, the respondents, other than the Hawaiian Trust Company, Limited, executed a promissory note to

the complainants reading as follows:

"$75,000.00             Honolulu, T. H., Nov. 7, 1930.

"Three (3) years after date, for value received, the undersigned jointly and severally promise to pay to E. H. Wodehouse, W. W. Chamberlain and Mark A. Robinson, Trustees under the will and of the estate of Bathsheba M. Allen, deceased, or order, the sum of seventy-five thousand dollars ($75,000.00), together with interest from date until fully paid at the rate of seven per cent. (7%) per annum, net above taxes, payable quarterly; principal and interest payable in gold coin of the United States of America or its equivalent at the office of the mortgagees in Honolulu.

"The undersigned reserve the privilege of paying the principal hereof in full on any interest payment date in case of the sale of the property mortgaged as security herefor, but only after giving sixty (60) days written notice of their intention so to do.

"If any default shall be made in the payment of interest or the performance of any of the covenants in the mortgage securing this note, the principal, together with interest, shall at once become due and payable.

"Secured by mortgage of even date herewith."

Concurrently therewith and as security for payment of the note the Hawaiian Trust Company, Limited, as trustee under the deed of trust, executed a mortgage to the complainants of the same Jake Brown property. The mortgage recited that it was made in consideration of $75,000 "paid by the mortgagees to the mortgagor, for the account of the owners of the beneficial interests under said trust agreement, the receipt whereof is acknowledged," and was in the customary form containing a particular description of the property and providing further as follows: "But if any default shall be made in the payment of the principal or interest of said note or in the observance or performance of any covenant herein contained, then in either of such events the whole of the principal sum of said note shall at once become due and payable and the mortgagees may foreclose this mortgage

by summary proceedings or otherwise, with or without first taking possession, and may sell all of the said premises or any part or parts thereof, together with all the right, title and interest of the mortgagor therein, and free from any trusts under the aforementioned trust, and all buildings and improvements that may be upon said premises, at public auction at such time and place in said Honolulu as to them may seem best after giving notice of intention to foreclose and of sale according to law, and may purchase at such sale or sales, and either in their own names or as the attorney in fact of the mortgagor hereby irrevocably constituted and appointed, may execute, acknowledge and deliver all necessary deeds or other instruments, give good and valid receipts for the purchase money and do and perform all such other acts as may be necessary fully to convey said premises or any part or parts thereof and such right, title and interest unto the purchaser or purchasers thereof and otherwise to carry into effect this power of sale, and said deeds, the power of sale having been exercised according to the provisions of this instrument, shall be effectual to convey unto the purchaser or purchasers at said sale the right, title and interest of the mortgagor and of the owners of the beneficial interests under said trust agreement, both at law and in equity." The owners of the beneficial interests under the trust agreement also executed the mortgage, jointly and severally covenanting and agreeing with the mortgagees, *inter alia,* as follows: "That they will pay or cause to be paid the said mortgage note herein referred to, principal and interest, as said principal and interest respectively fall due, and all taxes, rates, assessments or charges which may at any time be lawfully made or assessed by any governmental, county or municipal authority or become a charge upon the said premises or improvements or any part thereof or the debt secured

by this mortgage or upon the claims created by the said note, without deducting the same from said interest or debt, and will at the request of the mortgagees ·deliver to and deposit with, or cause to be delivered to and deposited with, the mortgagees all receipts for taxes, rates, assessments, charges or premiums paid as herein provided, within ten (10) days after said receipts are received."

Subsequently there was a failure to pay interest on the note and a failure also to pay the second half of taxes on the mortgaged property for the year 1932. Shortly thereafter this suit was instituted. The bill contains the averments usual in such cases and prays for the foreclosure of the mortgage by sale at public auction and for a deficiency judgment. Several answers, cross bills and demurrers followed which need not be further stated or referred to except as hereinafter appears. At first there seems to have been some confusion as to how far E. B. Hallberg was bound by the note and the mortgage but at the trial in the court below all the parties came to a definite understanding and agreement, and the court so ruled, that E. B. Hallberg's interest in the mortgaged land was subject to foreclosure and that he was not personally liable on the note for any deficiency judgment.

At the trial the complainants proved and the respondents in their pleadings and in their evidence admitted that the complainants had loaned to the Hawaiian Trust Company, Limited, for the benefit of the beneficial owners under the deed of trust the sum of $75,000 in cash and that the money thus received had been applied in payment of the note which the beneficial owners owed to the Hawaiian Trust Company, Limited, in connection with the purchase by them of the Jake Brown property as above stated. It was also proven and expressly admitted that there had been a failure to pay interest and a failure to pay taxes.

The trial judge ordered a foreclosure sale of the mortgaged property at public auction at an upset price of $82,000. The property was duly advertised for sale. In due course the commissioner reported that he had put the property up at auction, that no bids had been received and that he had postponed the sale to a named date. The court approved the commissioner's action, overruled a motion of the complainants for a reduction of the upset price or for an auction sale without an upset price and ordered the commissioner to attempt again to make a sale at the same upset price of $82,000. Again the commissioner reported that he had presented the property at auction and that no bids had been received. Thereafter the court, after hearing various motions by the parties, extended to the complainants two alternatives, one to have a decree of conveyance of the mortgaged property to them as representing $82,000 of the debt or having the sale postponed until the second week in September 1933, that being on July 5, 1933. The complainants declining to accept either offer, the court entered a decree ordering the respondents to execute a conveyance of the mortgaged property to the complainants upon the complainants' giving them credit of $82,000 upon their indebtedness under the note and mortgage and further ordered a deficiency judgment in favor of the complainants (a) in the sum of $151.25, being the expenses incurred in the auction sales, (b) interest on the principal of the mortgage debt from May 22, 1933, to the date of tender and acceptance of the deed and (c) interest on the balance, if any, remaining due to complainants after allowance of the credit of $82,000, from the date of the tender and acceptance. It is conceded that these items of interest would necessarily be inconsiderable.

Bearing in mind the long-continued and unvarying practice of courts of equity in these Islands in such cases,

this case, if it had been presented on the above facts at any time before the commencement of the present depression, would have resulted, as a matter of course, in a decree foreclosing the mortgage and ordering a foreclosure sale at public auction. One new factor and one only appeared in this case which could not have appeared prior to, say, 1929, and that was the existence of the severe economic depression which at the time of the institution of this suit was prevailing and still prevails in this Terrtory and throughout the nation.

In their answers the respondents who are the beneficial owners of the mortgaged property said: "That during the years 1931 and 1932 the entire United States of America and the Territory of Hawaii as a part thereof was suffering from a depression such as the United States of America and the Territory of Hawaii have never experienced; that business conditions in the United States of America and in the Territory of Hawaii have suffered most severely; that because of such depression there is for all practical purposes no market for real estate in the Territory of Hawaii and particularly in the City and County of Honolulu, and that it would be absolutely impossible at this time or for any reasonable period of time in the immediate future to obtain any buyer for the real estate described in the said alleged mortgage at any price at all adequate for the same." They were permitted to introduce evidence in support of this allegation. No evidence was needed to prove the fact alleged. The courts take judicial notice of a fact so well known as is that of the depression which has widely prevailed and is still prevailing throughout the country. "There can be no question as to the change in conditions upon which the new hearing was asked. Of that change we may take judicial notice. It is the outstanding contemporary fact, dominating thought and action throughout the country.

As the Interstate Commerce Commission said in its recent report to the Congress, 'a depression such as the country is now passing through is a new experience to the present generation.' " *Atchison Ry. Co.* v. *U. S.*, 284 U. S. 248, 260. That fact, however, of an existing financial depression whose end cannot yet be foreseen and whose duration therefore is indefinite cannot operate to deprive the complainants of the remedy by foreclosure which in a court of equity they would be entitled to in normal times. A more severe depression is not distinguishable in this respect from a less severe one. When persons speculate in the purchase of a piece of land at a time of comparatively high prices, believing that financial profit will come to them from the transaction, and borrow money to be used as an aid in the payment of the purchase price, giving a note and mortgage in usual and well known forms to secure repayment of the loan, they must take such chances as are involved of a fall in the price of real estate, just as clearly as they are entitled to reap the benefits of a rise in the market. It is true that a court of equity exists to do equity and that in ordering and carrying out a decree of foreclosure of a mortgage it should see to it that no injustice is done to either party. But in this connection all of the equities must be considered, not merely some of them. The equities affecting the mortgagees must be considered as well as those affecting the mortgagors. In the ordinary mortgage, and in the mortgage particularly under consideration, all of the parties, including the mortgagors, recognize and contemplate the possibility of a drop in values and of consequent inability on the part of the mortgagors to pay the principal and even the interest of their debt. They expressly stipulate that in the event of such inability the mortgagees shall have the right to foreclose by sale at public auction.

In the case of an investment or speculation, whichever it may be called, in the purchase of real estate, equity will not permit the placing of the burden of the loss, when prices have fallen, on the lenders or mortgagees while at the same time leaving the borrowers or mortgagors at liberty to reap the benefit of profits if prices rise. The language of an ordinary mortgage, and the language of the mortgage under consideration, clearly indicate that it was the intention and the understanding of both parties that the burden of the loss, if any in such a case, should rest upon the mortgagors who had borrowed and received the money of the mortgagees.

The hardship to or the misfortune of the mortgagors who find themselves constrained to suffer a loss because prices went down instead of up as they had hoped cannot justify a court of equity in disregarding the terms of the contract and in substituting other terms therefor. Courts of equity do not thus come to the assistance of persons of legal age and of sound mind in a transaction free from mistake and fraud who have merely committed an error of judgment as to the probable course of the market and who later find that they have entered into an improvident or a losing bargain. The loss in such a case must remain upon those whose foresight was inaccurate. Moreover when considering the hardship to the borrowers and mortgagors courts must not be unmindful of the possible hardship to the mortgagees who loaned their money in good faith in reliance upon the undertakings of the borrowers nor, in a case like that at bar in which the lenders are trustees, should the possible and even probable hardship to the widows, infants and other beneficiaries whom the trustees represent be overlooked. It may well be in any such case and probably is the fact in most of such cases that the money which it is sought to collect on foreclosure is needed by the lenders or by their beneficiaries

in order to meet debts of their own and inability to collect or delay in collection may well result in foreclosure against them of property which they mortgaged to secure their own borrowings. *McGown* v. *Sandford*, 9 Paige 290, 291.

Again, courts of equity cannot properly so conduct themselves in their judgments and in their decrees as to impair the obligation of contracts entered into fairly, deliberately and without fraud of any kind.

To hold that mortgagees must accept a deed of the mortgaged property and give therefor a credit of the whole amount of the mortgaged debt is to compel them against their will to make a purchase which they have not contracted to make and is substituting a new contract for the one that was entered into which expressly authorized them, in the event of breach of the contract of the mortgagors, to foreclose by sale at public auction.

This is not the first time in history that a financial depression has been sought to be used as a defense against the performance of contractual obligations. U. S. Law Rev. for July, 1933, pp. 325-329. As far back as the decade following the Civil War the defense of an existing depression was presented and disallowed by courts of equity. In *Caperton* v. *Landcraft*, 3 W. Va. 540 (1869), the supreme court ordered dissolved an injunction which had been granted restraining a sale, upon the allegation that "the land is about to be sold for cash at a forced sale at a time when in consequence of the general prevalent depression and extreme scarcity of money, and the season of the year, and the inclemency of the weather at the time of the proposed sale, such a sale must result in great pecuniary loss and sacrifice."

In *Muller* v. *Bayly*, 62 Va. 907, 910 (1871), the court said: "Then, what other ground of equity is there in the bill? Only the allegations that the time is unpropitious

for a sale, or was, when the bill was filed; that money was scarce; and that, owing to the large amount of the cash payment required, the sale, if made as advertised by the trustee Bayly, would be attended with great, if not irreparable, loss and injury to the wife and her children. Certainly these allegations can afford no just ground for enjoining the sale. It is not pretended that the terms of the deed were not strictly pursued by the trustee in advertising the sale; that he required a larger cash payment to be made by the purchaser than was authorized or prescribed by the deed." The injunction was dissolved.

"The causes set forth as the ground for the injunction" (against a sale) "seem to be insufficient. It cannot be pretended that the legal rights of creditors can be made to depend upon seasons, crops or the money market." *Miller* v. *Parker,* 73 N. C. 58, 60.

Out of the depression of 1893 arose other judicial declarations on the same subject. "Courts of equity are charged with no power of relief against the hardships and misfortunes which sometimes attend upon the prompt and rigid enforcement of debts and obligations which have matured in accordance with contracts whose validity is conceded. Deeds of trust to secure debts, with powers of sale upon short notice, which have been deliberately and fairly made, may, by being pushed to speedy sale immediately upon default, in times of unexpected depression, or even in ordinary times, cause property to sell for less than could reasonably have been expected at their dates, and be otherwise attended with results disastrous to the plans and hopes of their makers. Notwithstanding, they have grown into almost universal use under the permission and encouragement of the law, as a ready means of effecting loans; and while in some jurisdictions they have been limited in their scope and operation, they have rarely, if ever, been abolished, because, doubtless, their general

conveniences and advantages have been considered as more than counterbalancing the exceptional hardships which may result from their swift and sometimes merciless enforcement against an unfortunate debtor; these hardships being no greater, however, than those which have often attended a rigid or heartless enforcement of liens and debts by the ordinary legal process. As long as these contracts are entered into by permission of law, they must be respected and not interfered with, unless upon some well recognized principle of equity applicable alike to all contracts of the same general nature. Wherever the terms of the trust have been followed, and no violation of duty on the part of the trustees can be shown, the hardship of the condition of the mortgagor will not excuse the interposition of courts of equity. That 'times are hard' or 'money scarce,' or the 'time of year' unpropitious, or that the property would likely sell for a great deal more at a later period, afford no ground for equitable relief. Interference for such causes would be to impair the obligation of contracts and to extend the guardianship of the courts to those laboring under no disability to contract for themselves. Moreover, by interference upon slight foundation to prevent hardship to the debtor, one equally as great might be brought upon the creditor, who might also be the debtor of a third person, and thereby suffer even a greater disaster by failure to collect the money due him." *Anderson* v. *White,* 2 App. Cs. D. C. 408, 416, 417 (1894).

"The sale took place at the period of the great monetary stringency in 1893. The evidence tended to prove, that while this property was prior thereto worth about $35,000, that at the time of the sale its market value was not more than it sold for. * * * The sale having been made and the deed executed, without the least semblance of fraud or unfair dealing, in strict compliance

with the terms of the deed of trust by the trustee agreed upon between the parties to the deed of trust, subject to which the plaintiff took his deed with due notice of the relation that the trustee sustained to the beneficiary, the legal title to the premises passed to the grantee, and unless misfortune alone can be made a substantial and independent source of equity jurisdiction, to be exercised in behalf of one who does not even offer to do equity (either because he is unable or unwilling to do it) the plaintiffs have not a foot to stand upon in a court of equity. However strongly our sympathies may be enlisted for the unfortunate victim of hard times, they can not furnish a basis for equity jurisdiction, and such courts can not and ought not to be made the instruments of speculation in the future values of property even for the benefit of the unfortunate." *Lipscomb* v. *Ins. Co.,* 138 Mo. 17, 23, 24 (1897).

"His testimony is that in 'ordinary times' the land would be worth $100 per acre, but the investment company has in the record a vast volume of testimony to show that the appraisement was had and the sale made in a period of extreme business depression and financial stringency, and Mr. Scranton does not say that he believed the land to be worth $100 per acre at that time. The suggestions just made render it appropriate to here say all that is necessary upon the assignments relating to the fact that the sale was had during a period of panic and business depression. It would hardly require evidence to satisfy the court that August of 1893 was not a propitious time for the forced sale of land, but we cannot see how the courts can interpose upon such grounds for the protection of unfortunate debtors. Laws suspending actions for the collection of debts are not known to our jurisprudence, and the legislature could not constitutionally enact them, much less can the courts interpose to

provide such a suspension. The decree had been rendered, the period of redemption, unusually long, had expired, the mortgagees had a legal right to proceed, and the courts could not stay their hand or refuse them process merely because of circumstances of misfortune or hardship. Appeals for relief upon such grounds must be addressed to the conscience and mercy of creditors, and are wholly beyond the jurisdiction of judicial tribunals." *Nebraska Loan & Trust Co.* v. *Hamer*, 40 Neb. 281, 288 (1894).

To the same general effect is *Thomas* v. *San Diego College Co.*, 111 Cal. 358, 365 (1896).

War times are ordinarily periods of great financial stringency; and yet in 1814, referring to the war of 1812, Chancellor Kent said: "The existence of the war, as a general calamity, will not justify courts in interfering to interrupt the regular administration of justice, and the collection of debts." *Astor* v. *Romayne*, 1 Johns. Ch. 310, 311.

In 1915 the court of civil appeals of Texas, in *Floore* v. *Morgan*, 175 S. W. 737, 740, said: "It is a well-settled rule that an unpropitious market for the sale of properties is no ground for enjoining the sale."

"The fact of depression in value is no ground in itself for not upholding a sale under the trust deed, nor is a subsequent rise in value a ground for setting aside the sale. Those who speculate in real estate on credit take the risk of depression in value at the time the credit expires and those who buy for cash in time of depression are entitled to the benefit of a subsequent rise in value." *Smith* v. *Black*, 115 U. S. 308, 318 (1885).

Coming down to 1932, the court said in *Lewis* v. *Beall*, 158 Atl. (Md.) 354, 356: "If the sale took place during a period of financial depression, or of depreciation in the value of land, or of other adverse general conditions for which neither party is responsible, and hardship

thereby result, it is a consequence which must be borne as an incident of the contract, and the court cannot relieve one party to the contract without violating the contractual right of the other. * * * Unless there be fraud or misconduct, a mere inadequacy of price will not be sufficient to vacate the sale."

In *Bolich* v. *Ins. Co.*, 164 S. E. (N. C.) 335, the court in 1932 followed with approval the views which had been expressed in *Muller* v. *Bayly*, 62 Va. 910, and in *Lipscomb* v. *Ins. Co.*, *supra*.

"The sole ground alleged by appellee for the relief sought is that by postponing the proposed sale until times are better and the sale price of the security is enhanced to normal levels, the security may bring enough to satisfy appellee's unsecured claim as well as appellant's secured claim. It is true as a matter of course that these facts afford no ground whatever for the appointment of a receiver of the incumbered security, or to enjoin a proper sale thereof in satisfaction of a valid lien thereon." *Bank* v. *MacDonell*, 49 S. W. (2d) 525, 526 (1932). See also 3 Jones, Mortg. (8th Ed.), §2354.

There is not the slightest suggestion, in the case at bar, that there was any fraud or mistake in the execution of the note or of the mortgage. What the mortgagors did was done deliberately and with full knowledge of all material facts, including that of the possibility of a downward tendency thereafter in the market price of real estate.

With reference to the upset price of $82,000 imposed by the trial judge and the requirement of the decree appealed from that the conveyance by the respondents to the complainants of the mortgaged property should be upon the condition that the complainants credit the respondents with the payment of $82,000, it is claimed by the respondents that ample evidence was adduced tending to show that the value of the property at the time of the

foreclosure was $82,000 and on the other hand it is claimed by the complainants that there was not the slightest evidence tending to show that the value of the property at the time of foreclosure was as much as $82,000. The determination of this issue depends upon the meaning to be attached to the word "value" in this connection. For the respondents it is argued that the meaning attached to the word in foreclosure cases, before the existence of the depression, has now lost its force or validity and must be wholly disregarded and, apparently, that a new meaning must now be given to it, although just what that meaning should be we find difficulty in understanding from the arguments presented. Reference is made in this argument of the respondents to the "unique" situation of this particular parcel of land on the beach at Waikiki, to the desirability of the property for apartment houses, to the "fair and reasonable value" whatever that may mean, to the value to be ascertained by capitalization of the income-producing capacity of the property and to the "potential" value which is expected to become a real value in the course of time; and much reliance is placed upon the case of *Suring St. Bank* v. *Giese,* 246 N. W. (Wis.) 556 (1933). In that case the court said, *inter alia*: "The court takes judicial notice of the fact that the present economic depression has not merely resulted in a serious dislocation of the value of real estate, but also in the almost complete absence of a market for real estate. As a consequence there is no cash bidding at sales upon foreclosure. In normal times competitive bidding is the circumstance that furnishes reasonable protection to the mortgagor, and avoids the sacrifice of the property at a grossly inadequate sale price. In the present situation the device of a judicial sale largely fails of its intended purpose because of the lack of competitive bidding, and the question arises whether a court

of equity is wholly impotent to rise to the needs of justice and see that the parties are fairly and properly protected. This is not a situation in which ordinary logic with respect to values has much vitality. In theory, a thing that cannot be sold has no value, and so with a parcel of real estate that is offered for sale at foreclosure. It may be argued that it is worth what purchasers will pay for it, and no more, and that if the only price offered constitutes but a negligible part of its theretofore assumed value, it nevertheless represents the value of the real estate at that time. Such a conclusion is shocking to the conscience of the court, or, as the old equity courts said, to the conscience of the chancellor, and to all notions of justice as applied to this situation. Certainly the land has value so long as it or the buildings upon it may be used, and certainly in the case of farm lands, which constitute the homes of farmers, the premises have value in the sense of usefulness, however difficult it may be to translate this value into terms of dollars. Furthermore, this real estate, which is suffering from the consequences of a period of readjustment through which we are passing, has potential or future value which may legitimately be taken into account."

In so far as the depression is made the basis of the opinion just quoted we cannot adopt the reasoning of the court. We prefer the reasoning above outlined to the effect that courts of equity do not come to the rescue of those who, without fraud or mistake, have made improvident or unfortunate bargains in the more or less speculative purchase of real estate. It is further to be noted, however, that the situation described in the opinion of the Wisconsin court is not paralleled by that existing in the case at bar. The case before us is not one in which there has been a total failure of bids or anything like it. In the first place, the upset price was far higher than the

market value as indicated by the undisputed testimony and served effectually to stifle bidding. There has been as yet no opportunity for bidding. In the second place, the court below was informed of, and there is in existence today, an offer by the complainants to bid at the auction the sum of $65,000 for land which was mortgaged to them to repay a loan of $75,000 and interest. This is not comparable to a condition where "there is no cash bidding at sales" or "a thing that cannot be sold has no value." Nor is there any doubt of the propriety and the right of the mortgagees' bidding at the sale. When obtaining the loan the mortgagors expressly stipulated in the mortgage that the mortgagees "may purchase at such sale or sales."

In the New Jersey case of *Federal Title & Mortgage Guaranty Co.* v. *Lowenstein,* 166 Atl. 538 (1933), likewise relied upon by the respondents, the amount due as fixed in the decree was $41,787.36. At the sale the complainant was the only bidder and bid in the mortgaged premises for $100. The court said that "confirmation will be withheld unless and until the complainant purchaser stipulates that the fair value of the mortgaged premises, which for the purposes of this decision is fixed at $27,500, will be credited on the decree and deficiency suit prosecuted only for the balance thereof." There is no doubt that any sale made on foreclosure is subject to confirmation by the court and that the court may refuse to confirm where the highest bid offered is so grossly inadequate as to shock the conscience. *Ballentyne* v. *Smith,* 205 U. S. 285, 290; *Smith* v. *Ry.,* 17 Haw. 96, 104; *Smith* v. *S. S. City of Columbia,* 11 Haw. 709, 710. Such a case apparently was the New Jersey case.

The depression has not altered the meaning of words or the principles applicable in mortgage foreclosure cases. In determining what an upset price, if any, should be, or, at a later stage of the case, whether a sale should be

confirmed, it is the value at the time of foreclosure and not the value at the time of the execution of the mortgage which is to be ascertained; and by value is meant what the property will bring at public auction or private sale (as may be authorized or required by the terms of the mortgage itself) after due publication of notice and after a reasonable time sufficient to permit efforts to interest all reasonably available prospective bidders. See, for example, *Wilder's S. S. Co.* v. *Lurline,* 11 Haw. 83, 91. Measured by these standards there was no evidence whatever before the court that the mortgaged property was of the value, at the time of the foreclosure, of $82,000. Mr. S. W. King, a realtor of experience whose evidence is in the main relied upon by the respondents, testified: "If we take a value that disregards present depression prices, liquidation prices, I should think approximately 25 percent discount over the reasonable value before the depression started would be fair" value for the mortgaged property now. "That would bring it to about $3 a square foot for the land plus the value of the improvements or * * * $81,900 for the land plus $15,000 for the improvements or approximately $96,000." In November, 1930, the mortgaged property "had a fair value of $125,000, with a less chance of selling at that price. * * * I am not considering what I might sell the property for, I am considering the fair value of the property. * * * I should find a valuation today of $60,000 * * * and I still feel that is a little low * * * but at the figure I gave you * * * as to the cash value today amounting to somewhere in the neighborhood of $60,000 or $70,000, I think with a little effort, a little time, I should believe it is salable." It is clear that when this witness spoke of a value of $96,000 he was "disregarding present depression prices" and had in mind some other undefined sort of value. When he spoke of value in the sense understood by this court

his evidence at best is that the value was from $60,000 to $70,000. There was no other evidence more favorable to the respondents. Mr. W. W. Chamberlain, one of the complainants, experienced also in the purchase and sale of real estate, gave it as his opinion that "the value of said property does not exceed the sum of $65,000.00." He stated that the complainants "are prepared to bid the sum of $65,000.00 at a foreclosure sale" if they can have a deficiency judgment for the balance against the respondents other than Hallberg and are prepared to finance any other purchaser with eighty-five per cent of the purchase price. Mr. R. A. Kearns, another realtor, testified that in his opinion "the present value of said property is $63,100.00." Under these circumstances the requirement of an upset price of $82,000, like the requirement that the complainants accept the property at a valuation of $82,000, is wholly unsupported by the evidence and contrary to the evidence.

No instance of a strict foreclosure in this jurisdiction is known to us. Whether circumstances can be imagined under which in a foreclosure case a court of equity in this Territory would have the power to order the mortgagors to convey the mortgaged premises for the whole amount of the debt is a question that need not be considered. In the particular mortgage under consideration the mortgagees were legitimately given the contractual right to a foreclosure by sale at auction as well as the right to become the purchasers at a price to be fixed by the bidding at the sale and are insisting on those rights. To compel them to purchase at a price to be fixed by the court without a sale would be to impair the obligation of the contract, to vary its terms and to compel the mortgagees to enter into a contract not of their making. This, we think, a court of equity has not the power to do.

The decree appealed from is set aside and the cause

is remanded to the lower court with instructions to have the property offered at public auction under foreclosure, with or without an upset price, as to the trial judge in the exercise of a judicial discretion may seem best,—with the limitation, however, that if an upset price is fixed it shall not at this time be higher than $65,000. If, as is their right, the complainants shall abandon their present intention to bid $65,000 and no other such bid is offered, it will become necessary to reduce the upset price or to offer the property without any upset price.

*A. G. M. Robertson* (*Robertson & Castle* on the briefs) for complainants.

*C. N. Tavares* (also on the brief) for certain respondents.

*R. A. Vitousek* for respondent L. S. Cain.